UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

RICHARD GONZALEZ, JR., an Infant,
by his Mother and Natural Guardian,
DIVIAN RAMOS,

                               Plaintiffs,

                -against-

THE CITY OF NEW YORK, POLICE OFFICER
STEPHEN DIMARIO, SHIELD #13228 & JOHN
DOE POLICE OFFICERS AND DETECTIVES,

                             Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**14 CV 6006**

**COMPLAINT**

Civ. No.

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

JUDGE KOELTL

RECEIVED
AUG 01 2014
U.S.D.C. S.D.N.Y.

     Plaintiff, by his attorneys, GIORDANO LAW OFFICES, PLLC, complaining of Defendants, respectfully alleges upon information and belief:

### PRELIMINARY STATEMENT

    1.    Plaintiffs bring this action pursuant to 42 U.S.C. §1983 *et seq.* for an incident of police misconduct and deprivation of adequate medical treatment and deprivation of protected rights, including those rights under the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution, which transpired on or about April 19, 2014 and thereafter, when police officers employed by the City of New York, including Defendants Police Officer Stephen DiMario, Shield #13228 (hereinafter "DiMario") and John Doe Police Officers and Detectives (hereinafter "John Does") wrongfully detained and falsely arrested the 14-year-old Infant Plaintiff Richard Gonzalez, Jr. (hereinafter "Richie" or "Infant Plaintiff"); failed to provide adequate medical care and deprived the diabetic Infant Plaintiff of medical treatment necessary for the preservation of his life; and further maliciously prosecuted the Infant Plaintiff. All charges were ultimately dismissed in Richie's favor.

2014 AUG -1 PM 12: 02

COMMUNICATIONS UNIT
OFFICE OF CORP. COUNSEL
CITY OF N.Y. LAW DEPT.

## STATEMENT OF FACTS

2.     On or about April 19, 2014, the Infant Plaintiff, a 14-year-old seventh-grade special education student, was falsely arrested and charged with Attempted Murder in the Second Degree for the "Footlocker Shooting," which had occurred earlier that day at approximately 6:05 a.m. at 389 Knickerbocker Avenue in Brooklyn, NY.

3.     Immediately after the shooting, the Defendants, including Defendant DiMario interviewed the victim of the shooting, Isaiah, who repeatedly told the Defendants that Infant Plaintiff Richie was not the one that shot him.

4.     Nonetheless, Defendants pressured Isaiah in the hospital after the shooting and tried to force Isaiah to say that Richie was the perpetrator, even though Isaiah clearly and repeatedly insisted that Richie did not shoot him.

5.     Defendants chose to completely ignore the victim's own statements and the facts detailed below.  Instead of conducting an investigation to find the actual perpetrator of the Footlocker Shooting, Defendants decided to target Richie based simply on his name, "Richie." As described in more detail below, Defendants interrogated and threatened Richie, held Richie in custody overnight, and deprived Richie of insulin for over 14 hours, which caused Richie to become sick and resulted in transfers to four different hospitals during his time in custody.

6.     Upon information and belief, the actual perpetrator of the shooting had checked into a hospital to get treatment for a stab wound, which he sustained in the course of fleeing from the shooting.   Witnesses informed Defendants that the actual perpetrator was stabbed after the shooting.   The actual perpetrator's name was also "Richie," and witnesses identified the actual perpetrator by name, which is why Defendants targeted Infant Plaintiff Richie Gonzalez. Defendants ignored the information and failed to check local hospitals for an individual named

"Richie" who was stabbed and instead, with deliberate indifference to Infant Plaintiff Richie's rights, focused exclusively on Richie as the suspect to the shooting.

7.      At approximately 6:05 a.m., at the time of the shooting, Richie Gonzalez slept in his bed at home at 703 Knickerbocker Avenue in Brooklyn, which is almost one mile away from the location of the "Footlocker Shooting." Richie's bedroom is less than five feet away from his parents' bedroom.

8.      Richie is diabetic and wears an electronic pump programmed to automatically administer doses of insulin every hour. Richie gets tested four times per day. Richie's mother, Ms. Ramos, enters Richie's carbohydrate count into the pump, and the pump releases the proper amount of insulin into his system. The pump tests and electronically records Richie's blood sugar levels on a meter and also records the dates and times when Richie was tested.

9.      On April 19, 2014, Ms. Ramos tested Richie's levels at approximately 6:20 a.m. The meter records the time at which Richie's blood sugar level is tested.

10.     On April 19, 2014, between approximately 4:00 and 4:30 p.m., a Defendant Detective arrived at Plaintiffs' home, stated that Richie had been "in a fight," and stated that he wanted to question Richie at the 83rd Precinct.

11.     Defendants picked up Richie at Knickerbocker Avenue, approximately one block away from his home.

12.     In separate cars, Defendants transported Richie and his parents to the 83rd Precinct. Richie's parents could not hear anything that the Defendants said to Richie.

13.     At the precinct, in the presence of his mother and father, Defendants took Richie to an interrogation room, where approximately three Defendant Detectives repeatedly accused Richie of committing the Footlocker Shooting and claimed to have six eyewitnesses who had

placed Richie at the scene.  Richie and his parents denied the accusations, clearly stating the Richie was at home at the time of the shooting, explained that Richie is diabetic and that his sugar level was even checked around the time that the Defendants were claiming the shooting occurred.

14.     When Richie's mother left the interrogation room, requesting that no one speak to Richie until she returned from buying food for her son, Richie asked to use the bathroom.  Three Defendants followed Richie into the bathroom, closed and blocked the bathroom door, and cornered Richie.  With balled fists, the Defendant Detectives accused Richie of committing the Footlocker Shooting, tried to manipulate him into confessing to the shooting, and threatened, "You going down."

15.     When Defendants permitted Richie to exit the bathroom, Richie told his mother and father what had happened.  Ms. Ramos again told Defendants not to question her son without her present.  Defendants became enraged and tried to have Ms. Ramos removed from the precinct.

16.     Defendants questioned Richie in the interrogation room for approximately three hours, until approximately 8:00 p.m., but Richie continued to tell them that he had nothing to do with the shooting.

17.     Meanwhile, the actual shooter, also named Richie, was in a local hospital receiving treatment for the stab wound that witnesses said the shooter suffered when fleeing the scene of the shooting.

18.     At approximately 8:00 p.m., Defendants told Ms. Ramos that Richie was officially under arrest and that they would hold Richie overnight.

19.     Defendants allowed Ms. Ramos to remain at the precinct until approximately 2:00 a.m. and allowed her to check Richie's sugar level before she left.

20.     Early the next morning, on April 20, 2014, at approximately 8:00 a.m., before Defendants transported Richie to Central Booking, Ms. Ramos arrived at the precinct to give Richie breakfast and check his insulin.

21.     Defendants transported Richie to Central Booking and held him there for hours.

22.     At Central Booking, both Richie and Ms. Ramos repeatedly told Defendants that Richie needed his medication or he would get critically sick.

23.     Ms. Ramos brought with her to Central Booking a bag full of Richie's supplies, including Richie's insulin pump. One officer took Richie's supplies, but Defendants never gave insulin to Richie and never permitted Ms. Ramos to give insulin to Richie.

24.     Before Richie saw the judge, he felt nauseous, dizzy, and weak. He started gagging.

25.     Defendants took Richie to EMS, where Richie tested his own insulin levels. The reading showed that his levels were "high."

26.     An ambulance transported Richie to Long Island College Hospital. Richie had not received any insulin for over 14 hours, from approximately 9:00 a.m. to 11:21 p.m. Long Island College Hospital attempted to stabilize Richie, but decided to transfer him to another facility better equipped for the specialized care Richie required.

27.     Then, on or about April 21, 2014, Richie was transported to SUNY Downstate, where he received insulin. Richie was hospitalized at SUNY Downstate for approximately two nights, three days, during which Defendants kept Richie handcuffed to the hospital bed.

28.     On or about April 23, 2014, Defendants transported Richie back to Central Booking. Richie waited for approximately three hours before he was able to see a judge.

29.     Richie was arraigned on the charges of Attempted Murder and Assault, and his bail was set at $75,000.

30.     Ms. Ramos was finally allowed to give Richie his pump and his meter at Court through a Court Officer.

31.     Defendants transported Richie to Horizon Juvenile Center (hereinafter "Horizon").

32.     At Horizon, Richie's pump either "fell" or "ripped off," and he received no insulin for an extended period of time. Despite the fact that Horizon had insulin on site, Horizon's staff did not understand Richie's "sliding scale' and failed to provide insulin to him.

33.     At Horizon, Richie tested himself in the medical room, and saw that his blood sugar reading was "356."

34.     Richie was transported from Horizon to a third hospital, where his system was flushed with intravenous fluids for approximately three hours, but he did not receive insulin.

35.     Richie was eventually transported to Lincoln Hospital, the fourth hospital since his arrest, where he again did not receive insulin.

36.     When Richie returned to Horizon, he began to receive insulin through a syringe. This was the first time that Horizon staff had administered insulin since Richie's arrival.

37.     Defendants never informed Richie's parents of his condition or his location, when he was transported back and forth between Horizon and the two hospitals. Richie told his parents himself, when Ms. Ramos and Mr. Gonzalez visited Richie at Horizon.

38.     Richie was held at Horizon for another one and a half days before his release.

39.     The Brooklyn District Attorney's Office finally undertook its own investigation into the charges against Richie and quickly learned that Richie was only arrested based on his name and his being a "Facebook friend" of the victim, Isaiah, and recommended dismissing all charges against Richie, and all charges were ultimately dismissed in Richie's favor.

40.     As a result of Defendants' actions, Richie was deprived of insulin, medication that

he needs to survive; became gravely ill, and was transported to four different hospitals on four separate occasions. At the time that Defendants denied Richie medical treatment, Defendants knew, or should have known, that Richie's physical condition was serious and that administration of insulin was necessary for the preservation of his life, because Richie and Ms. Ramos repeatedly informed Defendants of Richie's diabetes and need for insulin from the pump which certain Defendants observed Ms. Ramos use on Richie.

41.    Richie missed approximately five days of school and his after-school program; and he suffered physical, emotional, and psychological injuries.

42.    As a result of Defendant's actions, Richie felt and continues to feel shame, humiliation, and embarrassment when students, friends, teachers, and neighbors discuss his arrest and when other students call him a "savage" and a "shooter."

43.    Despite the fact that all charges were ultimately dismissed in Richie's favor, young Richie has suffered, and will continue to suffer, the ramifications of being publicized and branded as either a "criminal" or as a "snitch."

44.    As a result of this incident, individuals physically attacked, beat, harassed, and threatened Richie because they accused Richie of being a "snitch" who had revealed the identity of the actual perpetrator of the Footlocker Shooting. Additionally, when Defendants learned that the charges against Richie were dismissed, they began to target him, and falsely accuse him of being a "gang" member.

45.    Plaintiffs feared for Richie's safety and wanted to move but could not afford to do so. Plaintiffs' Counsel reached out to the Brooklyn District Attorney's Office multiple times and requested assistance to transfer Plaintiffs to other Section 8 Housing, preferably in another county. Although the District Attorney's Office responded once and initially represented that the

D.A. would try to help by recommending the family's relocation, further efforts to communicate with the D.A.'s Office were unsuccessful and requests made for relocation assistance were completely ignored, placing Richie and his family in peril.

## JURISDICTION AND VENUE

46.     This Court has federal question jurisdiction pursuant to 28 U.S.C § 1331 in that this action arises under 42 U.S.C. § 1983 *et seq.*, and the Fourth, Eighth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 and the doctrine of pendent jurisdiction, since the state claims arise from the same operative facts and are part of the same case or controversy.

47.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant THE CITY OF NEW YORK resides in this District. Additionally, all Defendants are subject to personal jurisdiction in this District.

48.     Prior to the commencement of this action, and within ninety days after the claim arose, Plaintiff caused a Notice of Claim in writing to be served upon the Defendant THE CITY OF NEW YORK, by delivering to and leaving the same with the New York City Comptroller's Office, in like manner as the service of a summons in the District Court, which said Notice of Claim set forth the names and post office addresses of Plaintiff and her attorney, the nature of, time when, place where, and manner in which the claims arose, and the items of damage and/or injuries claimed, or that might have been sustained, so far as it was practicable.

49.     Over thirty days have elapsed since the service of such Notice of Claim, and THE CITY OF NEW YORK has failed to settle or adjust this matter.

50.     This action was commenced within one year and ninety days after the cause of action herein accrued.

**THE PARTIES**

51.     At all relevant times, INFANT PLAINTIFF RICHARD GONZALEZ, JR. and PLAINTIFF DIVIAN RAMOS were and remain residents of Kings County, New York.

52.     At all relevant times, Defendants POLICE OFFICER STEPHEN DIMARIO and JOHN DOE POLICE OFFICERS AND DETECTIVES acted in their official capacities and were employees, agents, or servants of Defendant THE CITY OF NEW YORK, acting under color of state law, within the meaning of 42 U.S.C. § 1983 *et seq.*

53.     THE CITY OF NEW YORK was and is a municipal corporation organized and existing under and pursuant to the laws of the State of New York. At all relevant times, Defendant THE CITY OF NEW YORK acted through its employees, agents and/or servants, including the individually named Defendants herein, who at all relevant times acted within the course and scope of their employment.

54.     Defendants POLICE OFFICER STEPHEN DIMARIO and JOHN DOE POLICE OFFICERS AND DETECTIVES are employees acting within the scope of their employment as officers of the New York City Police Department.

## AS AND FOR A FIRST CLAIM FOR FALSE ARREST PURUSANT TO 42 U.S.C. § 1983 AGAINST DEFENDANTS DIMARIO & JOHN DOES

55.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

56.     As described more fully above, on or about April 19, 2014, in the vicinity of 703 Knickerbocker Avenue, Brooklyn, NY, Defendants DiMario and John Does, acting without probable cause, intentionally, without justification, and with deliberate indifference to the rights, life, and liberty of the Infant Plaintiff, falsely arrested the Infant Plaintiff.

57.     As a result of the foregoing, Defendants DiMario and John Does, acting under color

of state law, violated 42 U.S.C. § 1983 *et seq.*, deprived the Infant Plaintiff of rights secured by the Constitution and laws of the United States, including those rights protected by the Fourth and Fourteenth Amendments, their right not to be deprived of life, liberty and property without due process of law, and other rights, privileges and immunities guaranteed by the laws and Constitutions of the United States and the State of New York.

58.     As a result of the foregoing, the Infant Plaintiff suffered loss of liberty and life, substantial emotional and psychological pain and was otherwise injured.

59.     As a result of the foregoing, Plaintiffs demand monetary damages against Defendants DiMario and John Does and further seek punitive damages against Defendants DiMario and John Does in an amount to be determined by a jury.

### AS AND FOR A SECOND CLAIM FOR MALICIOUS PROSECUTION PURSUANT TO 42 U.S.C. § 1983 AGAINST DEFENDANTS DIMARIO AND JOHN DOES

60.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

61.     As more fully described above, Defendants acted intentionally, maliciously, with reckless disregard for Plaintiff's rights, and without justification or probable cause when they caused criminal charges to be filed against the Infant Plaintiff.

62.     Such charges were ultimately dismissed by the Kings County Criminal Court.

63.     Defendants were aware, and should have been aware, that such criminal charges were false charges and that the Infant Plaintiff had not committed any crime, but nonetheless decided to and did file such criminal charges against the Infant Plaintiff with malice and with a deliberate and reckless disregard to the Infant Plaintiff's rights.

64.     Defendants were deliberately indifferent to Richie's rights in their failure to properly

investigate the circumstances relating to the Footlocker Shooting and in focusing on Richie as the only suspect based on his name and Facebook connection to the victim. Defendants recklessly rushed to pin the shooting on Richie and arrest him and refused to investigate by calling local hospitals and precincts for recent admissions with stab wounds; refused to listen to the statements of the very victim, who had repeatedly insisted that the Infant Plaintiff had not committed the crime and refused to identify the Infant Plaintiff as the perpetrator; ignored facts, such as the fact that the pump had electronically recorded Ms. Ramos's test on Richie at 6:20 a.m.; rushed to arrest the Infant Plaintiff; cornered, threatened, and attempted to manipulate the Infant Plaintiff while he was alone in the bathroom; and were otherwise deliberately indifferent to the Infant Plaintiff's constitutional rights.

65.     Defendants disregarded the obvious, and with malice and deliberate indifference to the Infant Plaintiff's rights, caused bogus criminal charges to be filed against the Infant Plaintiff.

66.     As a result of the foregoing, Defendants DiMario and John Does, acting under color of state law, violated 42 U.S.C. § 1983 *et seq.* and deprived the Infant Plaintiff of rights secured by the Constitutions and laws of the United States and the State of New York, including those rights protected by the Fourth and Fourteenth Amendments, his right not to be deprived of life, liberty and property without due process of law, and other rights, privileges and immunities guaranteed by the laws and Constitution of the United States and the State of New York.

67.     As a result of the foregoing, the Infant Plaintiff suffered loss of liberty and life, substantial emotional, mental and psychological pain, and was otherwise injured.

68.     As a result of the foregoing, Plaintiffs demand monetary damages against Defendants DiMario and John Does and further seeks punitive damages against Defendants DiMario and John Does in an amount to be determined by jury.

**AS AND FOR A THIRD CLAIM FOR DELIBERATE INDIFFERENCE TO THE
INFANT PLAINTIFF'S SERIOUS MEDICAL NEEDS PURUSANT TO 42 U.S.C. § 1983
AGAINST DEFENDANTS DIMARIO AND JOHN DOES**

69.     Plaintiffs repeat and reallege each and every allegation contained in the preceding
paragraphs as if fully set forth herein.

70.     Defendants DiMario and John Does, with deliberate indifference to, and with
reckless disregard for the life and safety of the Infant Plaintiff, failed to respond to the Infant
Plaintiff's repeated requests to receive proper medical treatment, insulin, and failed to respond to
Plaintiff Divian Ramos's repeated requests to administer insulin to her son during his
confinement. Defendants refused to allow the Infant Plaintiff to obtain proper medical treatment
while being actually aware of, and with deliberate indifference to, the fact that there was a
substantial risk that serious harm to or the death of the Infant Plaintiff would result.

71.     The conduct of Defendants DiMario and John Does, in failing to attend to the Infant
Plaintiff's medical needs, was intentionally injurious, reckless, callous, and/or or grossly
negligent, because Defendants were aware of, or should have been aware of, the Infant Plaintiff's
serious medical needs and serious medical condition.  Defendants knew or should have known
that treatment was necessary to preserve the Infant Plaintiff's health and life.  The Infant Plaintiff
and Plaintiff Ms. Ramos repeatedly informed Defendants that Richie is diabetic, needed insulin,
and needed his insulin pump, but Defendants deliberately, willfully and recklessly refused to
allow the Infant Plaintiff to get an administration of insulin, either from his mother or from a
medical provider on or off-site, until the Infant Plaintiff became gravely ill after more than 14
hours without insulin.

72.     Defendants DiMario and John Does either knew or should have known that failure to
provide timely medical treatment to the Infant Plaintiff could result in significant injury or the

unnecessary and wanton infliction of pain. Nonetheless, Defendants disregarded that serious medical need, causing the Infant Plaintiff great bodily harm and pain and suffering, requiring hospitalization.

73.     Defendants acted willfully, wantonly, and/or recklessly and negligently by continuously denying medical treatment to the Infant Plaintiff, specifically, insulin, which his mother had brought to the precinct and to Central Booking, as his condition rapidly deteriorated.

74.     For over 14 hours, Defendants refused to permit the Infant Plaintiff to use his pump or to get access to any insulin. During those 14 hours, both Richie and Ms. Ramos repeatedly informed Defendants that Richie is diabetic and would get very sick if he did not get his insulin. Defendants failed to take any action in response to Richie's serious medical needs and delayed Richie's access to medical treatment (insulin). This delay caused Richie to become gravely ill and required his transfer to four different hospitals to receive medical treatment necessary for the preservation of his life.

75.     As a result of the foregoing, Defendants DiMario and John Does, acting under color of state law, violated 42 U.S.C. § 1983 *et seq.* and deprived the Infant Plaintiff of rights secured by the Constitution and laws of the Unites States, including those rights protected by the Eighth, Fourth and Fourteenth Amendments and other rights, the right to be free from cruel and unusual punishment, and the privileges and immunities guaranteed by the laws and Constitutions of the United States and the State of New York

76.     As a result of the foregoing, the Infant Plaintiff suffered extreme pain and severe physical and psychological injuries, ultimately leading to his hospitalization.

77.     As a result of the foregoing, Plaintiffs demands monetary damages against Defendants DiMario and John Does and further seek punitive damages against Defendants

DiMario and John Does in an amount to be determined by jury.

## AS AND FOR A FOURTH CLAIM FOR NEGLIGENCE
## AGAINST ALL DEFENDANTS

78.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if more fully set forth herein.

79.     Defendants DiMario, John Does, the New York City Department of Corrections, and the City of New York owed a duty to the Infant Plaintiff, a 14-year-old juvenile held overnight in police custody, to provide him with a safe environment and at minimum, adequate medical treatment for serious medical needs and a serious medical condition.

80.     Defendants failed to provide the Infant Plaintiff with access to medical treatment by repeatedly denying his requests for medication and medical assistance, despite the fact that they knew or should have known of his immediate need for such treatment. In forbidding Richie from taking his insulin pump with him when they arrested him, Defendants put Richie's life in peril and set the stage for Richie not receiving proper medical attention once he was incarcerated and turned over to the Department of Corrections.

81.     Defendants routinely ignored Plaintiff Divian Ramos, the Infant Plaintiff's mother, who repeatedly informed Defendants that the Infant Plaintiff needed his insulin or he would become very sick. Defendants routinely ignored the Infant Plaintiff, who stated that he needed insulin or he would become very sick. Defendants refused to allow the Infant Plaintiff to wear his insulin pump and refused to give the Infant Plaintiff any medical supplies that were brought to Defendants by Plaintiff Divian Ramos.

82.     Defendants' failure to provide the Infant Plaintiff with access to medical treatment until he became gravely ill was both the actual and proximate cause of the Infant Plaintiff's injuries and ultimate hospitalization. But-for Defendants' denial of medical treatment, the Infant

Plaintiff's condition would not have deteriorated to the point of hospitalization. Furthermore, death or severe physical injury was a foreseeable result of Defendants' denial of medical treatment because the Infant Plaintiff's diabetes was so serious that he had to wear a pump programmed to automatically pump insulin into his body, hourly, on a sliding scale; and his mother tested his levels four times per day. Due to the Infant Plaintiff's confinement, he could not obtain treatment by any other means than through Defendants or with Defendants' permission.

83.     As a result of the foregoing, Decedent suffered extreme pain and severe physical and psychological injuries, ultimately leading to his hospitalization.

84.     As a result of the foregoing, Plaintiffs demands monetary damages against Defendants DiMario, John Does, and the City of New York.

## AS AND FOR A FIFTH CLAIM OF FALSE ARREST
## AGAINST ALL DEFENDANTS

85.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

86.     On or about April 19, 2014, Defendants, acting without probable cause, intentionally, without justification and with deliberate indifference to the rights, life and liberty of Plaintiff, falsely arrested and imprisoned the Infant Plaintiff.

87.     As a result of the foregoing, the Infant Plaintiff was caused to suffer serious bodily harm, loss of liberty and life, substantial physical, emotional, mental and psychological pain, lost time from school as a result thereof, and was otherwise injured.

88.     As a result of the foregoing, Plaintiffs demand monetary damages against all Defendants and further seek punitive damages against Defendants DiMario and John Does in an amount to be determined by jury.

## AS AND FOR A SIXTH CLAIM FOR MALICIOUS PROSECUTION
## AGAINST ALL DEFENDANTS

89.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

90.     Defendants, acting intentionally, maliciously and without justification or probable cause, caused to be filed an accusatory instrument or otherwise brought criminal charges of Attempted Murder and Assault against the Infant Plaintiff, who was criminally prosecuted therefore until such prosecution was terminated in his favor.

91.     As a result of the foregoing, the Infant Plaintiff suffered loss of liberty and life, substantial emotional, mental and psychological pain, lost time from his school and was otherwise injured.

92.     As a result of the foregoing, Plaintiffs demand monetary damages against all Defendants and further seek punitive damages against Defendants DiMario and John Does in an amount to be determined by jury.

## AS AND FOR A SEVENTH CLAIM OF NEGLIGENT HIRING AND TRAINING
## AGAINST DEFENDANT THE CITY OF NEW YORK

93.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

94.     The aforementioned occurrence took place by reason of the negligence of Defendant the City of New York, its agents, servants and/or employees, including various police officers regarding the hiring, retention, supervision and disciplining of the Defendants DiMario and John Does.

95.     As a result of the foregoing, the Infant Plaintiff sustained serious personal injuries and other consequential damages.

96.     As a result of the foregoing, Plaintiffs demand monetary damages against Defendant the City of New York in an amount to be determined by a jury.


**WHEREFORE**, Plaintiffs demand the following relief jointly and severally against all of the Defendants:

        a. Compensatory damages;

        b. Punitive damages against Defendants DiMario and John Does;

        c. Convening and empaneling of a jury to consider the merits of the claims herein;

        d. Costs and interest and attorney's fees;

        e. Such other and further relief as this court may deem appropriate and equitable.


Dated: New York, New York
       July 30, 2014


Giordano Law Offices PLLC

By: _____

     Carmen S. Giordano, Esq.
     *Attorney for Plaintiff*
     226 Lenox Avenue
     New York, NY 10027
     (212) 406-9466